Good morning, everyone. We're very appreciative and excited to have Judge Etkin here from New York. He's a district court judge who's agreed to sit with us by designation, and so we're happy to have him. Thank you for coming. Our first case for argument today is 24-1522 Life Science Logistics v. United States. Counsel, please proceed. Good morning, Your Honors. May it please the Court. The trial court erred by setting aside the agency's stay-override decision in this case without considering the injunctive relief factors which this court said were required under this precedent in PGBA. This is the latest in a line of cases of the Court of Federal Claims that has decided that there is somehow an exception to the standards for relief under 1491B and under PGBA, specifically in the context of stay-override decisions. That exception has no basis in the statutory text or in the rationale that this court applied in PGBA, and we ask the Court reverse for that reason. You say reverse. Can I start with you there? Because there's some tricky issues in this case, and I hope our disposition is not a tricky one. In your opening brief, you say if we exercise jurisdiction, we should reverse, but in your reply brief, you say we should affirm. Assuming we don't just dismiss, assuming we agreed with you that we actually have a case here, wouldn't it be an affirm? Because there's nothing for us left to reverse or to change. It should be a reverse. That may have been a typo in the reply brief. We're relying on the disposition that this court applied in the NECA Technologies case, which had a similar posture of mootness because of the expiration of the voluntary stay. Well, then wouldn't it be a vacate rather than a reverse? It could be. I believe what the court did in NECA Technologies, if I recall, was... You don't want us to reverse. Do you? I mean, that doesn't... I'm just trying to go off my memory of NECA Technologies. I believe it was a reverse without revamp, but vacater, I think, is an equally appropriate remedy here. The point is that a ruling that holds that it was improper for the trial court not to consider the injunctive relief factors and in some manner vacating that judgment, but we recognize because of the mootness issue that there's no need for further proceedings at the trial court at this point. Thank you. So let me proceed to address mootness because we recognize that it is obviously a threshold jurisdictional issue this court will have to resolve before proceeding to the merits here. We acknowledge that this issue is moot. The voluntary stay expired more than a year ago. We're relying on the capable repetition yet evading review exception to mootness. Now, we believe that NECA text resolves the evading review question. It addressed a very similar circumstance where there was simply a legal question as to the appropriate standard to evaluate a stay override decision. NECA text acknowledged the limited time period available for that review. The issue you've brought to us for resolution is a big issue that could affect many different kinds of cases. Is this mootness question and the capable repetition standard tempered such that it is only accurate or only appropriate to use it if it is likely to reoccur with regard to this particular litigant as opposed to this is a big question that needs to get answered and may affect lots of litigants? So I will acknowledge there is some ambiguity in this court's precedence on that question. But this is not just an issue for our court, right? Right. There are lots of courts that have confronted this. So why don't you just tell me what you think the standard of what it is. So as we understand the relevant Supreme Court precedent, primarily Kingdomware in the context of bid protests especially, it's that there has to be some showing of a likelihood of recurrence between the two named parties. That is how we understand the Supreme Court's standard that they applied in the Kingdomware decision. And, okay, if that is the applicable standard, it has to be between these parties, which, by the way, thank you because that's right. Your case would be better served if you could argue the other standard, but I appreciate the honesty. But so what is it about this scenario you think likely to repeat with this particular party? And I think there's just one piece of confidential information, which is like the number of possible ongoing contracts that may exist. So avoid that one thing. Right. So there is a little bit of confidential information here. I don't even know why that's confidential. Go ahead. There are national security concerns that were communicated to us by GSA and by HHS about some of the specifics of the strategic stockpile that we were instructed to remain confidential. And I'll answer to the extent I can without revealing that. What I will do first, though, is reference some of the appendix material. I think the determination and findings has in redaction some of this conversation as well. That's basically appendix 244 through 251. So that's what I'm relying on if the court wants to refer to that later on. But the fact that LSL will be a bidder on all of these contracts, including this particular one, I don't think is reasonably disputed. There are a very limited number of contractors capable of performing. It's a contract that the government has maintained for decades and will maintain for the indefinite future of the statutory authority as permanent. So the fact that there will be ongoing procurements for these sites and that LSL will be bidding on those contracts I don't think can reasonably be disputed. LSL has also protested virtually every single contract they do not receive, especially in this case. And I think it could be appropriate if the court wants to narrow its capable of repetition analysis to this particular procurement because of the unique facts here. We have a site that is designed to serve kind of the mid-Atlantic major metropolitan areas, Washington, Baltimore, Philadelphia, New York City, and the surrounding regions. And that site was the subject of the procurement that was the subject of these protests that LSL bid on, that LSL protested numerous times. That procurement for a permanent site is still ongoing. As we mentioned, the Key Bridge collapse in March of 2024 sort of changed the landscape. BWI was the airport that was designated to be the centralized airport logistics hub for this site. Obviously, the government needs to reconsider that without the Key Bridge being present as a transportation corridor. So this particular procurement for a permanent repository for this region is still an ongoing effort. LSL will be bidding on that. I don't think they would even dispute that. And based upon their history, if they don't get the contract, they will protest that. That has been their consistent behavior. And it's a reasonable posture. These are very long-term contracts. They're at least 10 years. They're very high value. There is perfectly good reason for contractors to want to protest and ensure that they're maximizing their chances of getting the contract.  Can I get you to move on to the merits? Yes. If there's something else you really feel like you need to say, do it. But let's just get to the merits. That's fine. No, I think that that covers our position on the mootness issue. So when it comes to the merits, our view is that PGBA and RAMCOR in combination resolve this issue. Let me just put PGBA aside for a second. Sure. Let's pretend it does not exist. Okay. Okay. So the textualist in me looks at CICA and says, all right, Congress thoughtfully balanced the circumstances in which the government can go forward and in which there needs to be a stay of the process. Because you've got 3AI, the contracting officer, may not authorize performance of the contract to begin while the protest is pending. So if there's a protest, the default is you can't go forward.  Right? And then Congress created an exception that is permissible. The permissible exception is if the government makes a written finding of either best interest or urgent and compelling. Two different things the government could do. Why shouldn't that define the universe of exceptions? Since Congress created a general rule and two, not one, two exceptions, both of which are, by the way, pretty liberal and a lot of deference would be given to the government in making that assessment and, you know, arbitrary capricious is a high standard. So why shouldn't that be the universe? And so if the government fails to establish best interest or urgent and compelling, why don't we revert to the default? Because the statute clearly lays out a default, which is can't perform. It does. And I think the mistake that some of the decisions in the Court of Federal Claims have made is conflating these two administrative aspects. I don't care about the Court of Federal Claims. They're not relevant to me. And I also don't care right now for this hypothetical purpose about this prior case of ours. We will get to, I just want to figure out what the right answer is for the statutory interpretation. And then we can talk about whether or not the other case is binding on us so that I can't get to the possibly right answer. So blank slate, here's how we understand the statute. There is procurement authority for the agency in all the various procurement authorities that exist. And the agency makes a decision under that authority to execute a contract. What SECA provides in 3553 is if that agency action to execute a contract or make some decision in connection with that procurement, if that is challenged at GAO through a bid protest, 3553 imposes an automatic stay of 100 days to allow review of that decision. So we have an agency decision, conduct something related to a procurement, and then we have a review provision, which is review that, automatic stay, go to GAO. Then we have an independent agency authorization for a separate decision, which is what should we do about that automatic stay? Should it be overridden or not? And that's authority that's granted under 3553C2. And the agency can, as Your Honor pointed out, exercise that authority under a fairly liberal standard to either override or not override the automatic stay. Yes. There is no review provision of the override decision in SECA. This is what the court was grappling with in RAMCOR. There is nothing that permits review by the courts or otherwise of that second agency action under 3553. What this court explained in RAMCOR was that the court could find a pathway to judicial review through 1491B1 because it is a decision in connection with procurement, as this court has held numerous times. And we don't dispute any of that. But the point is that you need to distinguish between the first agency action related to the procurement and the review provision that provides the automatic stay and the GAO review. That's one category. I guess I'm not understanding how I have to distinguish between them. There is a default rule, and then there is an exception to the default rule, which is the override provision. I see them as intertwined. I see Congress in a single section saying you stay it, but the government can override the stay in these circumstances. We both now agree that the whole thing is reviewable. So why do we add in the equitable factors associated with PI so that, I mean, under the circumstances you're proposing, it's possible for the government to override in a completely nefarious, completely frivolous manner, right? And then the stay would not go back into place under 3A little I, under that logic, unless the person who demonstrates the government has a completely nefarious, completely frivolous override argument on compelling or best interest or whatever, unless that person can also prove all these equitable factors in their favor. Why? Congress said default is you can't go forward unless you, government, can prove one of these two things. And, Your Honor, the statutory language we're relying on is the fact that Congress did not provide for judicial review of the stay override, period. There is no judicial review of the stay override in SECA. But that doesn't make sense, because if under 1491, if we can review A, we can review C. Of course. I mean, there's no reason why. That makes no sense. No, of course. And we're not saying it's not reviewable. We're saying it must be reviewable under the authority Congress provided in 1491B. There is no other way the stay override can be reviewable. There's no other statutory text that provides for judicial review. But if it is reviewable, sorry to interrupt. Yes. If it is reviewable under essentially APA principles, what about those principles brings in the necessity of the injunctive relief factors as opposed to declaratory relief? It's a separate thing, declaratory relief.  And then our position is. You've got to answer his question like that. Yes. Yes. We have to look to 1491B1, and we have to look at the text of 1491B1. And I will refer to PGBA not to say it's binding, but simply because it did that analysis, and we find it persuasive, even if the court's looking at this on a blank slate. There was a distinction between the adoption of the APA standard for the legal sufficiency review, which adopts the typical APA test arbitrary capricious contrary to law. But there was a change in 1491B, which is whereas the APA says shall set aside, in 1491B, Congress said that the court of federal clients may provide declaratory or injunctive relief, and also under subsection 3, that it must provide due regard to the needs of national security. And so what this court said in PGBA is that that means that the remedy is more discretionary than it is under a typical APA case. And in PGBA, just to be clear, PGBA did not require an injunctive, an injunction, did it? In that case, the court affirmed the granting of an injunction. The court's referring to the denial of an injunction. Denial of an injunction.  But it didn't say in these cases the court must issue injunctive relief as distinguished from declaratory relief. No, but the court did address the argument as to the functional difference between declaratory and injunctive relief. And there's language in there, arguably dicta, maybe not, that you're relying on that talks about when a declaration is coercive. Right. So basically you have to go through those factors.  And to the extent the court may see that as dicta, it is citing Supreme Court precedent on that point. Right. So we think it would be binding in that respect anyway. But yes, the analysis, again, even if the court doesn't want to just default to PGBA, we still think the textual analysis of 1491B is both correct and persuasive. In this context, is it possible for the protester to seek relief that is not coercive? That is, I know a lot of ink is spilled on is it declaratory relief, is it injunctive relief, but it really seems to come down to whether or not it's coercive. In the government's view, is it possible for the protester to win something at the Court of Federal Claims that is not so coercive as to trigger the four factors? So I'll answer that two ways. First, monetary relief is always available. That may or may not be sufficient in the protester's eyes, but that is a remedy that is always available for bid preparation. And the four factors would not apply to that. They would not apply. That is correct. In terms of a stay-over-ride review, I would think as a practical matter, in order to get relief that is meaningful to the protester, it would have to, as this court did, invalidate or set aside the stay-over-ride decision. Otherwise, there's no practical benefit. So we should understand at the end of the day, the government's view is that the four factors always apply in this context, regardless of whether we call it declaratory relief. Just because of the practical nature of the relief that's being requested. But can I ask a question? This is backing up to your 1491 analysis, which are you saying there's more discretion between declaratory and injunctive relief? I'm trying to understand what you're saying about this. No. Our understanding, and I see that I'm into my little time. No, no. Just keep going. My understanding is informed by the citation of Samuels B. in PGBA, which is that the difference between declaratory and injunctive relief is more functional than nominative. And the question is simply, what is the practical effect of the relief being requested? If it is asking to set aside a government action, it needs injunction analysis, whether it's being styled as declaratory or injunctive relief. And so even though, yes, the statute authorizes both in determining whether the injunctive relief factors need to be considered, the Supreme Court has Okay, right. Whether it's a coercive. Right. I get it. But do you think 1491 creates some discretionary distinction between injunctive relief on the one hand and declaratory judgment relief on the other in terms of the amount of discretion? Based on what you just said, I feel like you want it both ways. You want me to say 1491 creates a different amount of discretion that the trial court has for injunctive relief versus DJs, but then you want to, on the flip side, say, but I should treat any coercive DJ as injunctive relief for purposes of the PI factors. No, Your Honor. Do you see the problem I'm having? I do. I feel like your arguments are at war with each other. And I don't think that's the argument we're making, so let me see if I can clarify it. The point that we're making is that we read 1491B as providing discretion to the trial court in granting either declaratory or injunctive relief, that it has discretion to impose either form of relief based upon its consideration of the merits and the appropriate remedy. When considering whether there is a material difference in how that discretion is to be exercised between declaratory and injunctive relief, we're relying on the Supreme Court precedent saying, you look to the practical effects of the relief, not the name that it's styled under. That's the point. Thank you. One more, if you don't mind. Yes. Just on the textual language of CICA itself and the provisions you were talking with the Chief about, is it the government's view that CICA is silent on the question? We have to decide whether the four factors apply or not? Yes, Your Honor. Why is there not an implication at least against you from the ease with which the stay is imposed? It's automatic. Why doesn't that at least imply that there's not a great deal that should have to be shown by the protester at our stage? So our view of the statutory text under CICA itself, if you just take that in isolation, is that the most meaningful part is Congress did not provide judicial review for a stay override at all. And so our view is that to the extent the Court reads anything into the meaning of CICA in isolation, the only result the Court could find is that there is no judicial review. Now, we're not arguing that. We recognize RAMCORP. We recognize 1491B. We recognize in connection with procurement. That's all settled. We're not making that argument. But if the Court is trying to glean anything from the narrow text. I really don't understand this argument. This argument makes no sense to me. How? Why? I don't understand your argument. We both agree there is judicial review of all of these actions under 1491. So why does the fact that the CICA statute, which already had 1491 in existence and Congress legislates with the knowledge of its prior work, why is the fact that they didn't add, double down, and just in case you're curious, not only does 1491 give you review authority, but let's put it right here in CICA. Why does that matter? Congress legislated this statute under the existing framework of there is judicial review of all of these actions. So why did Congress need to say there's judicial review in order for that to tell me anything about whether the PI factors need to be in there or not? Because the only part of CICA that addresses an automatic stay comes before an override is even in consideration. It has to necessarily.  Right. There's a rule and an exception laid out in a single section. I mean, there's like 40 words between the two. But just chronologically, the agency isn't even in a position to issue a stay override until the stay comes into effect, and then it evaluates the impacts of that stay. There's nothing unreasonable about Congress harmonizing the language of 3553 with 1491B to say, okay, we have a procurement decision that's protested at GAO. You get an automatic stay, but we're giving the agency authority to override that if certain conditions are met. Then what do we do after that override? We go to 1491B to say you can challenge that at the Court of Federal Claims, but the remedy, the relief you can obtain is the relief provided in 1491B. Again, that's RAMCOR. I'm not inventing that. That's how this Court elaborated on the relationship between CICA and 1491B and RAMCOR. As part of what you're saying, the ground has shifted by the time we get to the Court of Federal Claims. The government agency has made a new determination that was not in place at the time the automatic stay was imposed. That is exactly right, Your Honor. There are additional considerations. There are additional factors. Again, these are statutorily authorized, but they're things the agency would not have had reason or need to evaluate before the stay is imposed. It's a new agency decision with a new review decision. To be clear, we're talking about a 100-day stay, right? A 100-day stay? Yes, Your Honor. That's what this whole fight's over. Yes, Your Honor. Congress said the default is there should be a stay for just that 100 days, but the government can override it if there's these, like, big factors. And you're saying even if there are no big factors, we get our 100 days. No, Your Honor. Unless they can prove equity. No, Your Honor. I think we are relying on the presumption that the government will exercise its authority as required under the statute. No, but if we say it's arbitrary and capricious, if we conclude that the government's assertion of best interest was arbitrary and capricious, which is such a high standard. I mean, honestly, the government has to almost be nefarious to end up in that land, right? So we're talking about a tiny universe of cases in which the government almost nefariously decides something's in its best interest when it's just so clearly not. Well, I think this case provides a good counterexample. The court did not say that the government didn't have good reasons for the override. What the court said is the government didn't adequately document its reasons, which essentially turned this into a paper exercise, and there were ample national security considerations at issue. That's not the issue in front of me. I understand, but I want to make clear. But if that were an issue in front of me, I probably would tell you I don't think that that met the arbitrary and capricious standard. I appreciate that. I just want to make clear that we're getting adverse decisions not simply because there is an obvious arbitrariness, but we're getting adverse decisions in much broader sets of cases, which is why we're bringing this to the court's  Okay. We probably ought to let the other side have a shot at this. Thank you, Your Honor. And I'll restore your whole three minutes of rebuttal, which I'm sure you're really excited about. Mr. Hay. Good morning. Thank you, Your Honors. And may it please the court, Daniel Hay for the Appley Life Science Logistics. I want to begin with the important question that Chief Judge Moore, you raised about what the recurrent situation looks like. As I'll agree, it has to be a dispute between these same parties. And the government's capable repetition argument can't escape a simple fact. LSL has been a contractor for the strategic national stockpile for 18 years. In that time, it has been subject to one SECA stay override, the one in this case. In the two years since the decision was issued, it has not been subject to the same action. And, in fact, as far as the government tells us, no contractor in the history of DSS has ever been subject to an override here. Put simply, the government cannot carry its heavy burden to show that something that never happened before. Hasn't happened three times in this very case? No, it only happened the third time, Your Honor. There were three protests. Each time the determination was made that there was some error in the procurement, but only on the third try did GSA override the stay. And there's an important structural reason why this doesn't happen in the S&S context. Typically, these contracts are done well in advance of the end of the contract. If the government is coming up in a situation that there would be a lapse, it has many options at its disposal. It can issue a bridge contract. It can actualize options. It can sole source a short-term procurement. It can do something to make sure there's no lapse in coverage. Do you dispute that your client will certainly bid on this if we reopen the facility or this particular facility? I don't think it's certainly, but I think it's a fair assumption that if the specification comes out and their facility is qualified for it and it makes sense financially, I think there's the expectation they will bid. But there are a lot of contingencies that are still there. One would be if there is an award, does it go to LSL? Second is if it does go to LSL, does LSL protest, and does it go to GAO or the Court of Federal Claims? There's a lot of questions that will arise. And the Court addressed all these in Safeguard. I know Safeguard is unpublished, but it addresses the exact same legal question and found there is no jurisdiction for factual reasons all present here. I'm sure you're not going to like this, but can you just move on to the merits, please? Happily, Your Honor. So on the merits, I want to start with I agree with where my friend focused, which is that 1491B answers the question. I think in particular 1491B2 answers the question where Congress said that the Court of Federal Claims may issue any relief appropriate, including declaratory and injunctive relief. The government's position reads declaratory out of that provision. They try and address that by inventing this Frankenstein remedy where you can issue a declaratory judgment that is based on injunctive relief factors, but that is not what this Court required in PGBA. It's not what any court's position is. I mean, the Supreme Court has indicated that you have to look at the character or nature of what is being done. And so I think that this coercive declaratory judgment concept is not fictitious. Certainly, Your Honor. And so let me start by addressing PGBA. I know Sam was mentioning that also is illustrative here. In PGBA, the only question presented ñ I think he said binding. Go ahead. Sorry? I think he said binding, not illustrative. Yes, both binding and illustrative. But it's illustrative of our position here, which is in PGBA, the only question presented was whether the trial court erred by determining that the relief being sought was injunctive. The government has disclaimed that argument here. They say we don't dispute that the Court of Federal Claims issued a declaratory judgment, that it had the discretion to do so, or that it abused its discretion. Rather, it says that in issuing a declaratory judgment, it had to consider the four-factor EBAY standard. But that is not what PGBA said at all. PGBA does not address, change, heighten, or even discuss the standard for declaratory relief. All it stands for is the unremarkable proposition that where a party seeks an injunction, it has to meet the injunctive relief factors. And the facts of PGBA demonstrate why the case is different. There, the protests have been overruled. The contract is being performed. There was no statute that set this background principle of there being a stay for a period of time. The declaratory judgment on its own would have done nothing for the plaintiff there. And the way we know that is that the trial court found that there was an abuse of discretion, that there was an error in the awarding of the contract, but that still did not. So, to be clear, in one distinction you're drawing with PGBA, I just want to reframe it to make sure I'm understanding it, is that it wasn't in the context of SECA where the statute addressed there should be a stay, and then the statute created an exception for a stay. You're saying PGBA was divorced from this contractual or, I'm sorry, congressional decision about how this ought to operate. That's exactly right, Your Honor. And there, the relief being sought was twofold. The plaintiff wanted a declaration that the award was illegal and an order unwinding the contract requiring new procurement. We didn't seek that here. We didn't obtain it. And the reason why is that SECA reset automatically the status quo. An arbitrary and capricious override is void ad venitio. There was no need to compel the agency or prohibit the agency from doing anything. And, in fact, Judge Somers was clear. He said the government is free to ignore my order. It's free to issue a new DNF. It can issue the same DNF, and you can come back to me. Had that happened, we would have had to go back to the court and seek different and additional relief. You had to seek a PI, and then you would have had to meet the equitable. Exactly. But we could not have gone back and sought to compel the order, to enforce the order. It would not be enforceable by contempt. What Judge Somers said is he was answering a simple yes or no question in the affirmative. That was all that was needed in this case because of the background. The Samuels case that government counsel mentioned, I think, is also helpful here. That case also was not about the difference between that case also did not address the standards for issuing a declaratory judgment. That was a case where a defendant in a state criminal action saw a declaratory judgment that the prosecution violated the First Amendment. And what the Supreme Court said is the same comity principles in Younger that says courts can't enjoin state prosecutions also applies to the declaratory judgment context because the res judicata of that declaratory judgment would have the same result of stopping it. So it wasn't about the difference between declaratory judgment and equitable relief. It was about these background comity principles of deferring to state management of its own law. I'm a little confused on how this is not coercive. The action of the Court of Federal Claims here had the effect of declaring rights, and I think the government had no choice but to act consistent with what the court declared at that point. And if so, that meant they could not go forward and implement the contract with the party they wanted to, notwithstanding their finding that it was in the interest of the United States for compelling and urgent reasons. That feels coercive to me. What am I missing? I think two points, Your Honor. First is that to the extent there was any coercion, it was coming from the statute, not from the order. That the statute says there shall be no activity on the procurement. But can you help me on that? Because the statute has two parts that we've talked about. Part one was, sure, you get to stay based on just a protest, but part two was they get to override the stay based on certain findings that they clearly made here. Certainly, but those findings are arbitrary and capricious, and an arbitrary and capricious decision is of no legal effect. And so by declaring it to have been arbitrary and capricious, that wipes it out. But the second point is the government was free to ignore the ruling. Judge Summers said that in Appendix 111. And to take this to another context from the contracting, another example from the contracting standpoint, you know, if we had come and we were on a supply contract and we said we want a declaratory judge of our widgets conform to the specifications of the contract, and the Court of Federal Claims granted that, the government could still reject delivery of the goods. They could say we don't think this complies. We would have a very easy breach of contract case because we have a ruling from the Court of Federal Claims they do. But there was nothing compelling the government in that situation to accept delivery of the goods. Similar way here, there was nothing compelling the government to respect the order. Again, had they ignored the order, we would have gone back to the Court of Federal Claims. We would have to file a new case as the colloquy at the end of the hearing identifies. It would have gone back to Judge Summers. I think it would have been a very quick ruling, to be frank. But it would have nonetheless been a new action seeking new relief. In PGBA, couldn't the government have ignored the order, too? Which order? The order setting aside the contract award. So there was the order setting aside the contract award. There was a request for instructions they would have to stop performance, issue a new round of procurement. And so what the court there found is the relief you're asking me to provide is injunctive because you're asking me to compel the government to do some things and enjoin them from doing some things. So I think there, again, the government could have ignored it had that order been issued, but they would have been in contempt had that injunction been issued. So I think it's a different context when all you have is a declaratory judgment, particularly where the judge who's issuing is saying, if the government disagrees with me, they are free to ignore. So you don't think in PGBA that what they did was simply set aside the contract award in the same way the CFC set aside the override decision here? So in PGBA, the plaintiff lost there. So I guess, are you saying if they had won below, would that have been the same thing? I guess, yeah. So in that situation, I don't think so because the contract was being performed. There was no statute saying they cannot perform it in that instance the way there is here, that once you wipe out the override because it's arbitrary and capricious, there's a statute saying you cannot perform this contract absent a valid override. In the PGBA context, simply declaring the decision to be illegal, or the award to have been improper would not provide any relief. And the way we know that is the court found the award was improper. It granted the bid preparation cost. Can I ask, the government attorney, though this is not really before us, did bring up the point that the overrides are being found to be arbitrary and capricious with some frequency, or at least there's a significant number of fights over this? Is that true that you know of? I wouldn't say with some frequency. I think we cited about 12 to 15 cases since 2005 with Chapman, which is a seminal case in this context. These are issued quickly, so there may be additional minute orders that I'm not familiar with. But it's not happening with any great frequency, and it's certainly not happening in the context of the strategic national stockpile. This is a one-of-one that has not happened before, is unlikely to happen again, absent the government taking some arbitrary action where they manufacture the emergency that leads to the override. Can you remind me, what was the reason their override was rejected in this case as arbitrary and capricious? Certainly, and that probably requires going back a little bit to the reason for the override. So the contract for the facility at issue in this case was due to expire, and I believe it was either late December or early January. The government determined that they needed to override the stay so that they could begin conditioning a new facility. There was multiple factors why that was arbitrary and capricious. One was the fact that the facility is already empty due to the government deciding to move things out of the facility prior to the contract, that the reasons for needing a new facility were simply saying the new contract is better, which this court has said are never reasons to prefer one contract over the other, and that the stay period was so short that it was going to take four to six months to condition a new facility that the 100 days wasn't actually going to interfere with that. So I disagree that it was a lack of explanation, that that is what arbitrary and capricious review is. You look at what the government explained and determine whether there's factors missing or improperly considered. But the reason we do that is that when those factors aren't documented, we assume it's because they could not be met. And so here the government could not show that there was some urgent and compelling need to the government that was not caused by their own decisions, that could not be addressed by exercising the option that remained in the contract to stay with LSL, by issuing a bridge contract, by finding a short-term facility, and that those reasons are why this is unlikely to occur, because in every case the government has options to ensure there's not going to be this lapse in coverage between the end of one contract and the next in this very important context. The finding of the government action being arbitrary and capricious here, is that at all bound up with whether the four-factor test should apply or not? That is, let's just say if we could rewrite history and the court did apply the four-factor test, is there any chance that its finding of arbitrary and capriciousness could be different because it would have been asking arguably different or more questions? I don't think so. So the Court of Federal Claims applied the Riley factors, which are not controlling, because this Court has never endorsed them, but are the general approach to the Court of Federal Claims. Judges take and assign this, and it looks at the reasons, the alternatives. It's similar to the State Farm Analysis and typical arbitrary and capriciousness view designed specifically for the contracting situation. There was no meaningful consideration under those factors of reparable harm, balance of the equities. But it probably is worth mentioning that not only is this case moot, not only do we think we're writing the standards, but any error, and there was none, was harmless, because LSL made a documented and overwhelming showing that there was a reparable injury to us in the form of lack of competition, which was not only documented in the hearing, but then proven to be accurate, as we note in footnote one, when the government blew through its estimate of how much this would cost by five times as much, giving our competitor a seven-, eight-figure head start on the next procurement. There's also the public interest. This Court in Supreme Court has said that the public interest has an interest in a fair contracting system. So even had the Court below decided it had to consider the equitable factors, we more than show them. So the Court, respectively, I would submit, should not reach out to issue an advisory opinion in a case that's moot where the alleged legal error here would make no sense. Coming back to mootness, I do have one other question on that. Of course. As you've alluded to, the Court of Federal Claims has dealt with this issue maybe about a dozen times. They're not in unanimous agreement. If we don't reach the issue here, will their lack of unanimity on that question remain? That is, will we ever have a clear standard for the Court of Federal Claims to apply if we don't decide it? So I guess two answers, Judge Stark. So first, I think you're right that the courts are not unanimous, but they're pretty close to unanimous. There's only one non-dicta case that applies the argument the government is advancing here. Almost all of the decisions and all of the recent decisions, as far as I know, apply what Judge Summers did below. The second is, and this goes to the evading review prong, is there's other ways this issue could get before the court. So RAMCOR, which is the seminal case for the legal standard for judicial review of state overrides, came to this court because there was an EAJA application. And in many of these cases where the bidder meets the qualifications for the EAJA fee shifting, the question before the court will not just be, are they entitled to fees, but was the underlying decision correct? And so this issue could come up to the court through that route. And in addition, as we mentioned in our 28J letter, the government also could have moved more quickly to get interim review from this court. It could have decided to seek a relief pending appeal. It could have sought expedition. It chose not to do that. And what this court said in e-simplicity where I think the timing was 60 days, it said if the appellant doesn't move quickly enough, they cannot then find refuge in the capable repetition. The Newdown line of case from the D.C. Circuit says the party invoking the exception has to make full effort to try and avoid mootness. And so I think there are other ways this issue could come before the court and could have clarity for the court and federal claims. Okay, thank you, Mr. Hay. Thank you, Your Honor. Counsel, you have three minutes of rebuttal back. Thank you, Your Honor. I just have three brief points I'd like to make. To answer Your Honor's question about the frequency of stayover rides, our office has received five complaints since October 1st for stayover rides. Now, those don't always proceed to litigation. Sometimes we try to work those out. I think the ambiguity about the standard that we'll be subject to. So five bid protesters who the government decided the stay should not be in effect and they've reached a decision to make an override, five people are complaining about those decisions? Correct. Okay, so but since October. Do you have any reason to think that that is an empirically representative number? Because respectfully, this administration has at times done things differently than other administrations, which has at times caused a tiny bit of conflict or litigation. So do you think that that number you just gave me from October until now would actually be the same number that applied, say, four years ago or six years ago? It might be a slight uptick, Your Honor. I take that point. It's not completely out of sample. I think in a typical year we probably have between 10 and 20 of such cases. Now, again, they don't always proceed to litigation. We will often try to resolve them if we can pre-litigation or before a ruling on the case. But that's about the pace that we typically see. The only other two points I want to make in the context of PGBA. So I heard my friend use a couple times all the court was doing here was wiping out the override, and then the stay goes back into place. But I think that's really the distinction that we're trying to emphasize. A court can't wipe away an agency decision without restraining the agency and setting aside what the agency wants to do. That is the course of act. And so I want to make sure I'm clear on that, that it has nothing to do with the imposition of the automatic stay. It's about telling an agency, not only do I think you were wrong, but I am issuing an order declaring that the thing you did is now invalid, null. It is removed from the record. It's as if it didn't exist. But isn't that always what declaratory judgments do? In the context of government cases, that is probably true, Your Honor. And I think this is important to remember. Declaratory relief can be obtained in private litigation, and there may be a whole host of scenarios where that wouldn't be the case. Think about assigned property rights, IP rights. There may be a declaration of rights that doesn't necessarily invalidate something, but that may be useful in other contexts. I do think it's true that in government litigation, pretty much most of the time, you're going to be doing something to invalidate what the government did if you're declaring it unlawful. It just kind of goes with the territory. I mean, an example I was thinking about is Hampton Dellinger, who was the head of the Office of Special Counsel. There was litigation when he was removed earlier this year, and Judge Jackson in the DDC issued a decision on March 1st saying, I'm going to enjoin his removal, but not as to the President, but I'm going to declare his removal invalid as to everyone, including the President, because of the trickiness of enjoining the President. And that's a distinction that's interesting, but it still has legal effect. It undoes the removal as a legal matter. Why is that different here? So I don't want to take a position on behalf of the government in that case, but I do think if we're looking at the analysis this Court applied in PGBA, it would practically be the same, at least in the bid protest context. And that's the last point I'll just make briefly, which is PGBA, one of the plaintiff's arguments on appeal was that in denying their request for a remedy, the trial court also erred in converting their requested relief for declaratory judgment into an injunctive relief test. That was one of their arguments, and this Court squarely addressed that argument and said, no, that was not error, because under Supreme Court precedent, we do a functional analysis and we see the effect of the relief that you're looking for. So that was, in our view, squarely addressed in PGBA. The hardest thing for me between PGBA and this case is that there is a decision by Congress here in SECA as to what should happen if the government is not able to establish an override. So I'm just telling you flat out, this is my problem. This is where I'm struggling. I appreciate that, and to be candid, Your Honor, I think that's the struggle of a lot of the court of federal claims decisions that we see. I think we do see that logic in some of the court of federal claims decisions, saying, well, what do we do about the fact that Congress did provide for some automatic relief? And I think in our view, the biggest distinction is the automatic relief is preliminary by nature. We view that as essentially removing the requirement that would ordinarily be the case in federal court to obtain preliminary interim relief before the merits are judged, but that once the agency makes further findings and provides further evidence of record and makes a new administrative decision about the override, then it's not exactly a final judgment, but it's moved beyond that very preliminary interim step, where there is essentially very little record for an adjudicator. And so we do believe that it would not be inconsistent with the scheme Congress has laid out to say that is more than just preliminary interim relief. We now have additional findings, additional agency action, and it would be appropriate that if that action is to be set aside or nullified, that the plaintiff needs to make a stronger showing under the injunctive relief practice. Can I just add one more? But my concern is, in this case at least, that second step was arbitrary and capricious. And so why should we give it any weight at this point? And, again, we fall back to under 1491B, this Court has made clear, a finding of arbitrary and capriciousness does not entitle the plaintiff to relief, at least through. No, the statute says what should be the default. That's the problem, right? And, again, I think we have to put meaning to the fact that Congress did not provide judicial review for an override, so we have to look to 1491. It is our position. Okay. I want to thank both counsel, and for all of you, this was an outstanding oral argument. You were both really great, extremely well-prepared, very informative. It was really helpful. I don't often see this good a job by both lawyers. So thank you so much. And for all the law clerks up there, I hope you were paying close attention. This is what I expect all of you to do. Thank you.